## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

RANDY LEE EVANS, JR.,                    :

        **Petitioner**                    :        **CIVIL ACTION NO. 3:24-1370**

    **v.**                    :        **(JUDGE MANNION)**

WARDEN GARZA,                    :

        **Respondent**                    :

### MEMORANDUM

Before the Court is *pro se* Petitioner's petition for a writ of habeas corpus under 28 U.S.C. §2241. For the reasons set forth below, the Court will deny the petition.

### I.    BACKGROUND

### A.    Factual Background

On October 28, 2020, *pro se* Petitioner Randy Lee Evans, Jr. ("Evans") was sentenced to a total term of incarceration of one-hundred-and-four (104) months after pleading guilty to possession with intent to distribute marijuana (21 U.S.C. §841(a)(1), (b)(1)(D)), possession with intent to distribute cocaine (21 U.S.C. §841(a)(1), (b)(1)(C)), and felon in possession of a firearm (18 U.S.C. §§922(g)(1), 924(a)(2)), in the United States District Court for the Middle District of North Carolina. *See* (Doc. 1 at 1); *United States v. Evans,*

*Jr.*, No. 1:19-cr-391-1 (M.D.N.C.), Doc. 28.[1] Evans is currently incarcerated at United States Penitentiary, Canaan ("USP Canaan") in Waymart, Pennsylvania. (Doc. 1 at 1.) According to the Federal Bureau of Prisons ("BOP") Inmate Locator (https://www.bop.gov/inmateloc/), Evans's anticipated release date is June 18, 2026.

Prior to his incarceration at USP Canaan, Evans was incarcerated at Federal Correctional Institution Bennettsville ("FCI Bennettsville") in Bennettsville, South Carolina. (Docs. 11-2 ¶ 9; 11-9 at 1.) While incarcerated at FCI Bennettsville, Evans received disciplinary sanctions pertaining to two (2) incident reports, with said sanctions ultimately leading to him filing this Section 2241 habeas action. (Doc. 1 at 2.)

## 1.    Incident Report No. 3781449

On June 6, 2023, Correctional Officer A. O'Connor ("Officer O'Connor") issued Incident Report No. 3781449 against Evans for possessing drugs/alcohol and possessing an unauthorized item on the same date at

---

[1] The Court takes judicial notice of the docket in Evans's underlying criminal case. The Court also notes that although Evans's judgment of sentence was not entered until October 28, 2020, his sentencing hearing occurred on October 14, 2020. *See Evans, Jr.*, No. 1:19-cr-391-1 (M.D.N.C.), Unnumbered Docket Entry Between Docs. 27 and 28. This explains why Evans indicates that he was sentenced on October 14, 2020, in his habeas petition. (Doc. 1 at 1.)

10:10 a.m. (Doc. 11-14 at 2.) Officer O'Connor's Incident Report described

the incident at issue as follows:

> I Officer A. O'Connor was assigned to A-1 unit on DW on
> 6/6/2023 at approximately 10:10 am I was making a random
> round in the unit. When I reached cell 112, I smelled a strong
> odor of homemade alcohol. While searching the cell I searched
> Inmate Evans, Randy #35021-057 [sic] secured locker and I
> found 1 bag of what appeared to be homemade alcohol, 1 metal
> stinger, and 1 bag of potatoes. I notified compound officers, and
> a test was done of the unknown substance on the Alco Sensor #
> and it tested at greater than .400. Inmate Evans was in
> possession of alcohol, a metal stinger, and potatoes which is all
> unauthorized. Inmate EVANS, RANDY, #35021-057 and Inmate
> . . . are both assigned to cell 112.

(*Id.*) Officer O'Connor signed and dated the Incident Report on June 6, 2023,

at 10:11 a.m. (*Id.*)

Evans did not receive Officer O'Connor's original Incident Report

because it was returned to Officer O'Connor for a rewrite. (Docs. 1 at 2; 11-

6 at 2.) Officer O'Connor then issued a rewritten Incident Report, which

described the incident at issue as follows:

> This is a Re-Write.
> I Officer A. O'Connor was assigned to A-1 unit on DW on
> 6/6/2023 at approximately 10:10 am [sic] I was making a random
> round in the unit. When I reached cell 121, I smelled a strong
> odor of homemade alcohol. While searching the cell I found 3
> bags of what appeared to be homemade alcohol, and 3 Mount n
> Dew [sic] bottles filled with an unknown substance which had the
> odor of alcohol. One locker contained 2 bags of intoxicants and
> the 3 bottles. The other locker contained 1 bag of intoxicants. I
> notified compound officers, and H. Warren tested the unknown
> substance on the Alco Sensor SN#067481, and it tested >.400.

- 3 -

Inmate EVANS, RANDY, #35021-057 and Inmate . . . # . . . were
both assigned to cell 121 when the contraband was found.

(Doc. 11-5 at 2.)

It appears that Lt. M. Roberts ("Lt. Roberts") delivered a copy of the
rewritten Incident Report to Evans on June 8, 2023, at 10:20 a.m. (*Id.*)[2] The
following day, Evans received and signed copies of his Notice of "Inmate
Rights at Discipline Hearing" ("Notice of Inmate Rights") and "Notice of
Discipline Hearing Before the [Discipline Hearing Officer ("DHO")]" ("Notice

---

[2] Following Officer O'Connor's creation of the rewritten Incident Report,
the records in this case are somewhat confusing as to when Evans received
notice of the report. In the first instance, it is unclear when Officer O'Connor
completed his rewritten Incident Report because it is signed and dated on
the same date as the original Incident Report, *i.e.* June 6, 2023, at 10:11
a.m. *Compare* (Doc. 11-5 at 2), *with* (Doc. 11-14 at 2). It is highly unlikely
that Officer O'Connor drafted both documents simultaneously.

Additionally, the rewritten Incident Report indicates that Lt. Roberts
delivered it to Evans on June 8, 2023, at 10:20 a.m. (Doc. 11-5 at 2.)
However, in the "Part III – Investigation" portion of the rewritten Incident
Report, it states that Lt. Roberts advised Evans of his right to remain silent
at all stages of the disciplinary process on June 7, 2023, at 10:01 a.m. (*Id.* at
4.) It also stated that Evans "was properly identified and received a copy of
the incident report," "was advised of his rights and acknowledged and
understood his rights," "declined to make a statement," and "displayed a fair
attitude." (*Id.*) This language, along with its location in the rewritten Incident
Report, could be interpreted as stating that Lt. Roberts advised Evans of his
rights and gave him a copy of a version of the Incident Report on June 7,
2023.

Regardless of this lack of clarity in the available record as to what
precisely occurred, for purposes of this Memorandum, the Court presumes
that Evans first received a copy of the rewritten Incident Report on June 8,
2023.

- 4 -

of Hearing"). (Docs. 11-10 at 2; 11-11 at 2.) Evans's Notice of Inmate Rights

indicated as follows:

> As an inmate charged with a violation of Bureau of Prisons rules or regulations referred to the Discipline Hearing Officer (OHO) [sic] for disposition, you have the following rights:
>
> 1. The right to have a written copy of the charge(s) against you at least 24 hours prior to appearing before the Discipline Hearing Officer;
>
> 2. The right to have a full-time member of the staff who is reasonably available to represent you before the Discipline Hearing Officer;
>
> 3. The right to call witnesses (or present written statements of unavailable witnesses) and to present documentary evidence in your behalf, provided institutional safety would not be jeopardized;
>
> 4. The right to present a statement or to remain silent. Your silence may be used to draw an adverse inference against you. However, your silence alone may [sic] not be used to support a finding that you committed a prohibited act;
>
> 5. The right to be present throughout the discipline hearing except during a period of deliberation or when institutional safety would be jeopardized. If you elect not to appear before the OHO [sic], you may still have witnesses and a staff representative appear on your behalf;
>
> 6. The right to be advised of the DHO's decision, the facts supporting that decision, except where institutional safety would be jeopardized, and the DHO's disposition in writing; and,
>
> 7. The right to appeal the decision of the OHO by means of the Administrative Remedy Procedure to the Regional Director within 20 calendar days of notice of the DHO's decision and disposition.

> I hereby acknowledge that I have been advised of the above
> rights afforded me at a hearing before the Discipline Hearing
> Officer. I have further been advised that if I have previously
> received either a presumptive or effective parole date from the
> Parole Commission, a finding by the OHO [sic] that I committed
> the prohibited act(s) may result in a rescission or retardation by
> the Parole Commission of the presumptive or effective parole
> date.

(Doc. 11-10 at 2.)

Evans's Notice of Hearing advised him that he was entitled to have a

full-time staff member represent him at the hearing, and he had "the right to

call witnesses at the hearing and to present documentary evidence in [sic]

[his] behalf . . . ." (Doc. 11-11 at 2.) Evans indicated on the Notice of Hearing

form that he did not to have a staff member represent him at the hearing and

did not wish to call any witnesses on his behalf. (*Id.*)

A DHO held a Disciplinary Hearing relating to the rewritten Incident

Report No. 3781449 on June 14, 2023. (Doc. 11-6 at 2.) The DHO then

issued a "Discipline Hearing Officer Report" dated June 21, 2023. (*Id.* at 2–

5.) In this Report, the DHO concluded that Evans committed the act of

possessing drugs/alcohol – Code 113 and imposed sanctions consisting of

a loss of forty-one (41) days' Good Conduct Time ("GCT"), thirty (30) days'

disciplinary segregation, the loss of commissary for six (6) months, and the loss of visitation privileges for six (6) months.[3] (*Id.* at 4.)

In reaching this conclusion, the DHO's Report indicated that Evans admitted to the alleged misconduct during the hearing and summarized Evans's statement at the hearing as follows:

> Your due process rights were reviewed with you by the DHO at the time of the hearing. You stated you understood your rights and had no documentary evidence to present. You were advised of your right to remain silent and indicated you did receive a copy of the report as indicated by the lieutenant. You did not request any witnesses or the services of a staff representative to assist you at the hearing. You were advised of your right to appeal after receiving the DHO report. You indicated to the DHO you were ready to proceed with the hearing.

> When you were given an opportunity to make a statement you said, this is not a reflection of my character. I take responsibility for the contents in my room and specifically in my locker.

(*Id.*) The DHO's Report also indicated that Evans was "advised that the [Incident Report] was rewritten to provide [him] with additional details to adequately defend [him]self," and Evans had "advised the DHO [that] this did not interfere with [his] ability to defend [him]self." (*Id.* at 3.)

---

[3] The DHO also removed the "prohibited act of Code 305, Possessing Unauthorized Item . . . because it was consumed [sic] within the offense conduct for the prohibited act of Code 113, Possession of Drugs/Alcohol." (*Id.* at 3.)

The DHO's Report explained that the specific evidence the DHO relied upon to support their findings was as follows:

> The DHO based this decision on the facts presented in the body of the written report: This is a Re-Write. I Officer A. O'Connor was assigned to A-1 unit on DW on 6/6/2023 at approximately 10:10 am I was making a random round in the unit. When I reached cell 121, I smelled a strong odor of homemade alcohol. While searching the cell I found 3 bags of what appeared to be homemade alcohol, and 3 Mount n Dew [sic] bottles filled with an unknown substance which had the odor of alcohol. One locker contained 2 bags of intoxicants and the 3 bottles. The other locker contained 1 bag of intoxicants. I notified compound officers, and H. Warren tested the unknown substance on the Alco Sensor SN#067481, and it tested >.400. Inmate EVANS, RANDY, #35021-057 and Inmate [Redacted] were both assigned to cell 121 when the contraband was found.

> The evidence photograph depicting the homemade intoxicants and the ALCO-Sensor IV reading of greater than .400 was used to determine the intoxicants were found and tested as reported.

> The supporting memorandum provided by Officer Warren was used to support the written report. Officer Warren reported the homemade intoxicants were tested with the ALCO-Sensor IV and provided a reading of greater than .400.

> When you were given an opportunity to make a statement you said, this is not a reflection of my character. I take responsibility for the contents in my room and specifically in my locker.

> The DHO based the decision on the greater weight of the evidence provided by the written report, evidence photograph and supporting memorandum. The officer was specific when stating while making rounds, an odor of alcohol was coming from your assigned cell. A search of your cell was conducted, and 3 bags of homemade alcohol and 3 Mt. Dew bottles filled with homemade alcohol was found. Both lockers in the cell were found with the homemade intoxicants inside of them. The

evidence photograph documented the homemade intoxicants were found and tested as reported. The supporting memorandum provided by Officer Warren was used to determine the intoxicants were tested in accordance with policy and provided a positive reading of greater than .400. The DHO considered your admission that this is not a reflection of your character, and you are taking responsibility for the contents in your room and specifically in your locker. When you arrived at FCI Williamsburg, you received a copy of the Inmate Handbook wherein you were advised the Bureau of Prisons has a zero tolerance for drugs and alcohol. Based on the fact the officer found intoxicants in your cell and in both lockers in your cell, and you admitted possession of the intoxicants, there is enough information to support the charges against you.

(*Id.* at 3–4.)

The DHO Report also stated the following reasons for the sanctions imposed:

Possession of drugs/alcohol in a correctional setting is a very serious violation in that they pose a serious threat to the security of the institution and staff safety. In the past, inmates under the influence of drugs or alcohol have become violent towards other inmates as well as staff. Good conduct time was disallowed because of the severity of the offense and to deter this activity in the future. It is apparent your conduct reflects poor institution adjustment and does not warrant the same consideration for good conduct time as those inmates following the rules and regulations of the Bureau of Prisons. This is also a mandatory sanction for your sentencing guidelines.

The sanction for disciplinary segregation was imposed due to the severity of your offense. It is apparent that your adjustment in population has been poor up to this point. Hopefully, this sanction will influence your future decisions to commit an offense such as this. The time you spent in the special housing unit prior to the DHO decision was considered when determining the actual amount of time in disciplinary segregation.

> The sanctions for loss of commissary and visiting privileges were imposed due to your poor institutional adjustment and behavior. Privileges are meant for those inmates who follow rules and regulations and do not present a management problem for staff or pose a threat to the security of the institution, self, or others. This sanction has been imposed to correct the present inappropriate behavior and deter future behavior of this type. The DHO hopes that the sanctions will motivate you toward more self-discipline in the future.

(*Id.* at 4–5.)

Evans was provided with a copy of the DHO's Report on July 6, 2023. (*Id.* at 5.) The Report stated that Evans was "advised of his right to appeal this action within 20 calendar days under the Administrative Remedy Procedure." (*Id.*)

Evans filed an appeal from the DHO's decision to the Regional Office, which was received on July 20, 2023. (Docs. 11-2 ¶ 4; 11-4 at 3.) The Regional Office rejected the appeal on or about September 12, 2023.[4] (Doc. 11-4 at 3.) Evans did not pursue any further administrative remedy with

---

[4] The record supplied by Respondent relating to Evans's administrative appeal indicates that the reason his appeal was rejected was "LEG RSR." (Doc. 11-4 at 3.) Respondent appears to have interpreted these abbreviations as indicating that the appeal was rejected because it was illegible. *See* (Doc. 11 at 10 ("On September 12, 2023, the Remedy was rejected as illegible while he was still housed at FCI Bennettsville.")). Ultimately, the Regional Office's reason for rejecting the appeal is irrelevant for purposes of the analysis in this Memorandum.

respect to the rewritten Incident Report No. 3781447 and related proceedings. (Docs. 1 at 2–3; 11-2 ¶ 4; 11-4 at 3.)

### 2.    Incident Report No. 3803470

On July 27, 2023, Correctional Officer D. Powell ("Officer Powell") issued Incident Report No. 3803470 against Evans for possessing a hazardous tool on that date at 10:50 a.m. (Doc. 11-15 at 2.) It described the charged incident as follows:

> On July 27, 2023, I SOS D. Powell was assigned as Alpha one unit officer. While conducting irregular rounds I observed inmate reg # Randy Evans talking to himself in cell 225. I entered the cell and asked inmate Evans who he was talking to. Inmate Evans was wearing earbuds. Inmate Evans responded I was talking to my wife. I gave inmate Evans a directive to produce the cell phone. Inmate Evans complied and produced a black in color Samsung cell phone.

(*Id.*) Officer Powell signed and dated this Incident Report on July 27, 2023, at 11:40 a.m. (*Id.*)

As with the prior Incident Report, Evans did not receive Officer Powell's original Incident Report because it was returned to Officer Powell for a rewrite. (Docs. 1 at 2; 11-7 at 2; 11-8 at 2.) Officer Powell then issued a rewritten Incident Report, which described the incident at issue as follows:

> This is a Re-Write.
> On July 27, 2023, I Officer D. Powell was assigned as Alpha one unit officer. While conducting irregular rounds I observed inmate reg #35021-057 Randy Evans talking to himself in cell 225 at approximately 10:50 am. I entered the cell and asked inmate

> Evans who he was talking to. Inmate Evans was wearing earbuds and responded I was talking to my wife. I gave inmate Evans reg #35021-057 a directive to hand over the cell phone, which he complied and gave me a black in color Samsung cell phone. The IMEI number could not be located. Compound officers and the Operations Lieutenant were notified, inmate Evans was escorted to the Lieutenant's office without further incident.

(Doc. 11-7 at 2.)

A copy of the rewritten Incident Report was delivered to Evans on July 28, 2023, at 11:15 a.m. (*Id.*) At that time, Evans "was read his rights and acknowledged he understood his rights," "was given a copy of th[e] incident report," "made the following statement, Man this is late, yall [sic] can t [sic] do this," and "displayed a fair attitude during the investigation." (*Id.* at 4.)

On August 2, 2023, Evans received and signed copies of his Notice of Inmate Rights and Notice of Hearing. (Docs. 11-12 at 2; 11-13 at 2.) Evans's Notice of Hearing again advised him that he was entitled to have a full-time staff member represent him at the hearing, and he had "the right to call witnesses at the hearing and to present documentary evidence in [sic] [his] behalf . . . ." (Doc. 11-12 at 2.) Evans indicated on the Notice of Hearing form that he chose not to have a staff member represent him at the hearing and did not wish to call any witnesses on his behalf. (*Id.*)

A DHO held a Disciplinary Hearing on August 9, 2023. (Doc. 11-8 at 2.) The DHO then issued a DHO Report dated August 16, 2023. (*Id.* at 2–5.)

In this Report, the DHO concluded that Evans committed the act of possessing a hazardous tool (the cellular phone) – Code 108 and imposed sanctions consisting of a loss of forty-one (41) days' GCT, thirty (30) days' disciplinary segregation, a forfeiture of fifty (50) days of non-vested GCT, the loss of phone privileges for six (6) months, and a monetary fine of $22. (*Id.* at 4–5.)

In reaching this conclusion, the DHO's Report summarized Evans's statement at the hearing as follows:

> Your due process rights were reviewed with you by the DHO at the time of the hearing. You stated you understood your rights and had no documentary evidence to present. You were advised of your right to remain silent and stated you did receive a copy of the report as indicated by the lieutenant. You did not request any witnesses or the services of a staff representative to assist you at the hearing. You were advised of your right to appeal after receiving the DHO report. You did not raise any objections to the Discipline Process prior to or during your appearance before the Discipline Hearing Officer. You indicated to the DHO you were ready to proceed with the hearing.
>
> When you were given an opportunity to make a statement before the DHO, you stated, that's not entirely true. I was not talking on the phone; I never made any statement about talking to my wife. I was in possession of a cellphone.

(*Id.* at 2–3.) The DHO's Report also indicated that Evans was "advised that the [Incident Report] was not delivered within 24 hours of staff becoming aware of the incident, because it was returned for a rewrite to provide [him] with more details to defend [him]self," and Evans "did not provide any reason

[why] this interfered with [his] ability to defend [him]self" at the hearing. (*Id.* at 3.) It further stated that the specific evidence the DHO relied upon to support their findings was as follows:

> The DHO based this decision on the facts presented in the body of the written report: This is a Re-Write. On July 27, 2023, I Officer D. Powell was assigned as Alpha one unit officer. While conducting irregular rounds I observed inmate reg #35021-057 Randy Evans talking to himself in cell 225 at approximately 10:50 am. I entered the cell and asked inmate Evans who he was talking to. Inmate Evans was wearing earbuds and responded I was talking to my wife. I gave inmate Evans reg #35021-057 a directive to hand over the cell phone, which he complied and gave me a black in color Samsung cell phone. The IMEI number could not be located. Compound officers and the Operations Lieutenant were notified, inmate Evans was escorted to the Lieutenant's office without further incident.

> The DHO considered the evidence presented. The evidence supports/confirms the written statement of the Reporting Staff Member. The evidence includes the photograph depicting a black in color Samsung cellphone. The photograph documented the cellphone was found as reported.

> Your statement to the Lt. during the investigation was considered. You stated, "Man this is late, y'all can't do this."

> Your statement to the Unit Disciplinary Committee was considered. You stated, "No comment."

> When you were given an opportunity to make a statement before the DHO, you stated, that's not entirely true. I was not talking on the phone; I never made any statement about talking to my wife. I was in possession of a cellphone.

> Therefore, after deliberation the DHO concluded that you, Inmate Evans 35021-057, did commit the prohibited act of Code 108, Possession of a Hazardous Tool (cellular phone). The decision

to find you guilty was based on the information contained in the
written statement from the reporting staff member, the evidence
photograph and your admission. The officer clearly reported you
were observed talking to yourself. The officer entered your cell,
saw you were wearing earbuds and you stated you were talking
to your wife. You were ordered to hand over the cellphone, you
complied and handed the officer a black in color Samsung
cellphone. The evidence photograph documented the cellphone
was found as reported. The DHO considered your statement that
the incident report isn't entirely true, you were not talking on the
phone, you never made a statement about talking to your wife
and you were in possession of a cellphone.

Although you stated that you weren't talking on the [sic] and you
never stated you were talking to your wife, you were still in
possession of a cellphone. The use of cellular telephones can
allow an inmate to plan an escape without the chance of staff
monitoring the call. You would also be able to make threats to
civilians or use the phone for other potential criminal acts in the
local community, which could potentially harm civilians in the
community. For all these reasons listed, it is not intended that
inmates make telephone calls which are not monitored. Based
on the fact the officer observed you talking on cellphone with
earbuds in your ears, and you admitted possession of the
cellphone, there is enough information to support the charge
against you.

(*Id.* at 4.)

The DHO Report also stated the following reasons for the sanctions

imposed:

The action/behavior on the part of any inmate to possess,
manufacture, or introduce a hazardous tool into any correctional
institution threatens the safety and security, not only of the
inmate involved, but that of the entire institution. As in the past,
inmates have used hazardous tools to affect escapes, and
seriously injure other inmates and staff. Possession of a cell
phone is not authorized. Cell phones are considered a hazardous

- 15 -

tool in a prison setting as they cannot be monitored or controlled and can seriously threatens [sic] the security and the orderly running of the institution.

Good conduct time was disallowed, and forfeiture of non-vested good conduct time was sanctioned because of the severity of the offense and to deter this activity in the future. It is apparent your conduct reflects poor institution adjustment and does not warrant the same consideration for good conduct time as those inmates following the rules and regulations of the Bureau of Prisons. This is also a mandatory sanction for your sentencing guidelines.

The sanction for disciplinary segregation was imposed due to the severity of your offense. It is apparent that your adjustment in population has been poor up to this point. Hopefully, this sanction will influence your future decisions to commit an offense such as this. The time you spent in the special housing unit prior to the DHO decision was considered when determining the actual amount of time in disciplinary segregation.

The sanction for loss of telephone privilege was imposed due to your poor institutional adjustment and behavior. Privileges are meant for those inmates who follow rules and regulations and do not present a management problem for staff or pose a threat to the security of the institution, self, or others. This sanction has been imposed to correct the present inappropriate behavior and deter future behavior of this type. The DHO hopes that the sanctions will motivate you toward more selfdiscipline [sic] in the future.

The sanction for monetary fine was imposed to punish the offender financially, since he has displayed a disrespect for the rules and regulations. In the past, less sever [sic] deterrents, such as loss of privilege, has failed to correct his behavior for the severity of this charge. Limiting the amount of money offenders has [sic] to spend, is hoped to deter future misconduct.

(*Id.* at 5.)

- 16 -

Evans was provided with a copy of the DHO's Report on August 28, 2023. (*Id.* at 6.) The Report stated that Evans was "advised of his right to appeal this action within 20 calendar days under the Administrative Remedy Procedure." (*Id.*)

Evans filed an appeal from the DHO's decision to the Regional Office, which was received on October 17, 2023. (Docs. 11-2 ¶ 4; 11-4 at 3.) The Regional Office rejected the appeal on or about February 14, 2024, seemingly because Evans had sent it to the wrong Regional Office. (Docs. 11-4 at 3; 1 at 2.) Evans did not pursue any further administrative remedy with respect to the rewritten Incident Report No. 3803470 and related proceedings. (Docs. 11-2 ¶ 4; 11-4 at 3; 1 at 2–3.)

## B.    Procedural History

Evans commenced the instant action by filing the instant Section 2241 habeas petition in the United States District Court for the Eastern District of Pennsylvania on August 2, 2024. (Doc. 1.) On August 13, 2024, the Eastern District transferred the petition to this Court. (Doc. 4.)

Evans raises three (3) grounds for habeas relief in his petition. First, he complains that FCI Bennettsville staff violated his due process rights with respect to the Incident Reports because (1) they were served on him after the "24 hour time limit," (2) the DHO "did not put a time and date stamp on

- 17 -

the report" relating to Incident Report No. 3781449, and (3) "staff would not let [him] acess [sic] [his] personal property so [he] could properly defend [him]self." (*Id.* at 6.) Second, he asserts that he was transferred from [FCI Bennettsville] and "was not able to defend [him]self." (*Id.*) Third, and finally, he argues that the DHO's imposition of sanctions consisting of a monetary fine of $22 and the forfeiture of non-vested GCT, as part of Incident Report No. 3803470, "do[es not] meet [the] requirements for the type of punishment imposed." (*Id.*) For relief, he requests that the Court return him one-hundred-and-four (104) days of GCT, reimburse him the $22 that he paid in fines, and expunge the misconduct charges against him. (*Id.* at 7.)

Respondent filed a response in opposition to the habeas petition on September 30, 2024. (Doc. 11.) Evans has not filed a reply brief, and the time for him to do so has passed. Therefore, his habeas petition is ripe for disposition.

## II.  DISCUSSION

In Respondent's response in opposition to Evans's habeas petition, he argues that the Court should deny the petition because Evans (1) failed to fully exhaust his administrative remedies prior to filing it and (2) received all appropriate process which was due to him. (*Id.* at 2.) The Court will address each argument in turn.

## A.    Exhaustion

### 1.    Legal Standard

Despite the absence of a statutory exhaustion requirement attached to Section 2241, the Third Circuit Court of Appeals has consistently required a petitioner to exhaust administrative remedies prior to bringing a Section 2241 habeas claim. *See Callwood v. Enos*, 230 F.3d 627, 634 (3d Cir. 2000) ("Although there is no statutory exhaustion requirement attached to §2241, we have consistently applied an exhaustion requirement to claims brought under §2241." (citing *Schandelmeier v. Cunningham*, 819 F.2d 52, 53 (3d Cir. 1986) and *Arias v. U.S. Parole Comm'n*, 648 F.2d 196, 199 (3d Cir.1981))); *Moscato v. Fed. Bureau of Prisons*, 98 F.3d 757, 760 (3d Cir. 1996) ("Federal prisoners are ordinarily required to exhaust their administrative remedies before petitioning for a writ of habeas corpus pursuant to § 2241."). Exhaustion is required "for three reasons: (1) allowing the appropriate agency to develop a factual record and apply its expertise facilitates judicial review; (2) permitting agencies to grant the relief requested conserves judicial resources; and (3) providing agencies the opportunity to correct their own errors fosters administrative autonomy." *Moscato*, 98 F.3d at 761–62 (citations omitted). Significantly, "[e]xhaustion is not required if administrative remedies would be futile, if the actions of the agency clearly

and unambiguously violate statutory or constitutional rights, or if the administrative procedure is clearly shown to be inadequate to prevent irreparable injury." *Lyons v. U.S. Marshals*, 840 F.2d 202, 205 (3d Cir. 1988).

### 2.   The BOP's Administrative Process in Inmate Disciplinary Cases

The Bureau of Prisons has enacted specific procedures for disciplinary proceedings. 28 C.F.R. §§541.1–.8. Under these procedures, a staff member charges a prisoner with committing a prohibited act by issuing an incident report. *See id.* §541.5(a) ("The discipline process starts when staff witness or reasonably believe that you committed a prohibited act. A staff member will issue you an incident report describing the incident and the prohibited act(s) you are charged with committing."). The incident report ordinarily must be issued within twenty-four (24) hours of the time the staff member became aware of the prisoner's involvement in the incident. *See id.* (stating that inmates "will ordinarily receive the incident report within 24 hours of staff becoming aware of [the inmate's] involvement in the incident"). The incident is then investigated by a staff member. *See id.* §541.5(b) (indicating that "[a]fter [the inmate] receives an incident report, a [BOP] staff member will investigate it").

After the BOP staff member investigates the incident, the correctional facility's Unit Discipline Committee ("UDC") reviews the incident report and

takes one of the following actions: (1) finds that the prisoner "committed the prohibited act(s) charged[] and/or a similar prohibited act[] as described in the incident report"; (2) finds that the prisoner "did not commit the prohibited act(s) charged"; or (3) refers the incident report to the DHO for further review. *Id.* §541.7(a)(1)–(3). Prohibited acts are separated into four categories based on severity: Greatest, High, Moderate, and Low. *Id.* §541.3(a). If a prisoner is charged with a prohibited act in the Greatest or High severity category, the UDC automatically refers the incident report to the DHO for further review. *Id.* §541.7(a)(4).

When an incident report is referred to the DHO, a disciplinary hearing is conducted in accordance with the procedures set forth at 28 C.F.R. §541.8. Pursuant to these procedures, the prisoner is entitled to notice of the charges at least twenty-four (24) hours before the hearing. *See id.* at §541.8(c) (stating that the prisoner "will receive written notice of the charge(s) against [them] at least 24 hours before the DHO's hearing" and explaining that the inmate "may waive this requirement, in which case the DHO's hearing can be conducted sooner"). The prisoner is entitled to appear at the hearing and have staff representation at the hearing. *See id.* at §541.8(d), (e). The prisoner is also "entitled to make a statement and to present documentary evidence to the DHO on [their] own behalf." *Id.*

- 21 -

§541.8(f). A prisoner may request to have witnesses appear "before the DHO either in person or electronically" at the hearing on their behalf. *Id.* §541.8(f)(1). However, the DHO may refuse to call requested witnesses if "they are not reasonably available, their presence at the hearing would jeopardize institutional security, or they would present repetitive evidence." *Id.* §541.8(f)(3).

When rendering a decision on an incident report, the DHO considers "all evidence presented during the hearing." *Id.* §541.8(f). The decision of the DHO must be "based on at least some facts and, if there is conflicting evidence, on the greater weight of the evidence." *Id.* Following the hearing, the DHO must provide a written report documenting (1) whether the prisoner was advised of their rights, (2) the evidence relied upon by the DHO, (3) the DHO's decision, (4) the sanctions imposed by the DHO, and (5) the reasons of the DHO for imposing those sanctions. *Id.* §541.8(h)(1)–(5).

A prisoner dissatisfied with the DHO's decision "may appeal the [decision] through the Administrative Remedy Program, 28 CFR part 542, subpart B." *Id.* §541.8(i). Pursuant to the Administrative Remedy Program, a prisoner may file an appeal from the DHO's decision to the Regional Director for the region where the inmate is currently confined within twenty (20) calendar days of the DHO's decision. *Id.* §542.15(a). The Regional Director

then has thirty (30) calendar days to respond to the appeal. *Id.* §542.18. If the inmate is dissatisfied with the Regional Director's response, that decision may be appealed to the BOP's General Counsel at the BOP's Central Office within thirty (30) calendar days from the date of the Regional Director's response. *Id.* §542.15(a). General Counsel then has forty (40) calendar days to respond to the appeal. *Id.* §542.18. "No administrative grievance is considered to have been fully and finally exhausted until denied by the [BOP's] Central Office." *Sharpe v. Costello*, 289 F. App'x 475, 478 (3d Cir. 2008) (unpublished) (citing 28 C.F.R. §542.15(a)).

### 3.  Analysis

Respondent argues that Evans has failed to exhaust his habeas claims in this case because he (1) filed only one (1) administrative remedy per incident with the Regional Office, (2) never pursued any appeal to the BOP's General Counsel at the BOP's Central Office, and (3) does not assert that exhaustion would have been futile, identify any cause for failing to raise his arguments as part of the administrative proceedings, or otherwise suggest that his failure to exhaust should be excused. (Doc. 11 at 11.) The Court agrees with Respondent that Evans has failed to exhaust his administrative remedies in this case.

Liberally construing Evans's habeas petition, it is possible that he argues, through his second claim raised in his petition, that he was unable to fully exhaust his administrative remedies because he was transferred from FCI Bennettsville, "had been in transit for several months," and only received his rejection notices from the Regional Director in May 2024. (Doc. 1 at 3, 6). Although Evans does not provide evidentiary support for this argument, the Court has interpreted the record supplied by Respondent as indicating that Evans was transferred from FCI Bennettsville on September 13, 2023, and was in transit for several months before his arrival at USP Canaan in early January 2024. (Doc. 11-9 at 2.) Presuming that the Court's interpretation corresponds to Evans's argument, the Court would still find that he has failed to fully exhaust his administrative remedies.

The BOP's Administrative Remedy Program specifically provides that if "the inmate does not receive a response within the time allotted for reply, including extension, the inmate may consider the absence of a response to be a denial at that level." 28 C.F.R. §542.18. Based on this provision, Evans did not need to wait until receiving a response from the Regional Office before pursuing an appeal with the BOP's General Counsel. Instead, when he did not receive a response from the Regional Director within thirty (30) days of the Regional Director's receipt of his appeals, he was entitled to

consider his appeals denied and could then pursue his administrative remedies by appealing to the Central Office. Evans has acknowledged that he never pursued such an appeal (Doc. 1 at 2–3), and he has not asserted that he was precluded from doing so because he was "in transit" for several months.

Even if Evans was somehow precluded from pursuing his administrative remedies due to his transfer between prisons, it would not change the Court's conclusion that he failed to exhaust those administrative remedies when he received notice of the Regional Director's rejection of his appeals in May 2024. Evans does not assert that he attempted to file an appeal to the Central Office after receiving notice of the rejections. (*Id.*) More importantly, Evans could have, but did not, request an extension of time to file an appeal due to issues with him being in transit. In this regard, the Administrative Remedy Program states that "[w]hen the inmate demonstrates a valid reason for delay," the time limits for filing an appeal "may be extended." 28 C.F.R. §542.15(a). Valid reasons for delay include:

> a situation which prevented the inmate from submitting the request within the established time frame. Valid reasons for delay include the following: *an extended period in-transit during which the inmate was separated from documents needed to prepare the Request or Appeal*; an extended period of time during which the inmate was physically incapable of preparing a Request or Appeal; an unusually long period taken for informal resolution attempts; indication by an inmate, verified by staff, that

> a response to the inmate's request for copies of dispositions
> requested under § 542.19 of this part was delayed.

*Id.* § 541.14(b) (emphasis added); *see id.* §542.15(a) (indicating that "[v]alid reasons for delay include those situations described in §542.14(b) of this part").

Overall, Evans failed to exhaust the claims raised in his habeas petition because he did not pursue his appeals through the final level of the Administrative Remedy Program. He has not explained how his being in transit between correctional facilities from September 13, 2023, through early January 2024, precluded him from filing appeals to the Central Office when he could have considered the Regional Director's lack of timely responses to his appeals as denials, and then pursued appeals from those denials to the Central Office. He also did not attempt to obtain extensions of time to file appeals upon receiving notices of the rejection of his appeals in May 2024. He further has not offered any plausible excuse for his failure to act to fully exhaust his administrative remedies. Therefore, Evans's claims in his Section 2241 petition are unexhausted, and the Court will deny the petition.

### B.   The Merits of Evans's Habeas Claims

Although the Court concludes that Evans has failed to exhaust his claims in this case, the Court will presume, for sake of argument, that his

failure to exhaust could be excused in this case. Even presuming as such, the Court would deny the petition because Evans's claims are meritless.

Evans has asserted due process violations in his petition. (Doc. 1 at 6.) Liberty interests protected by the Fifth Amendment may arise either from the Due Process Clause itself or from statutory law. *Torres v. Fauver*, 292 F.3d 141 (3d Cir. 2002). It is well-settled that "prison disciplinary proceedings are not part of a criminal prosecution and the full panoply of rights due a defendant in such proceedings does not apply." *Wolff v. McDonnell*, 418 U.S. 539, 556 (1974). Nevertheless, there can be a liberty interest at stake in disciplinary proceedings in which an inmate loses GCT. *Id.* Since Evans's sanctions in his two misconduct proceedings included the loss of GCT time, he has identified a valid liberty interest in this matter.

A prisoner is entitled to the following minimum procedural due process rights when accused of misconduct in prison which may result in the loss of GCT: (1) the right to appear before an impartial decision-making body; (2) twenty-four (24) hour advance written notice of the disciplinary charges; (3) an opportunity to call witnesses and present documentary evidence in their defense when it is consistent with institutional safety and correctional goals; (4) assistance from an inmate representative if the charged prisoner is illiterate or complex issues are involved; and (5) a written decision by the fact

finder of the evidence relied upon and the rationale behind the disciplinary action. *See Wolff*, 418 U.S. at 563–67. In addition, the standard of review concerning the sufficiency of the evidence is whether there is "any evidence in the record that could support the conclusion reached by the disciplinary board." *Superintendent v. Hill*, 472 U.S. 445–46 (1985). This standard "does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence." *Id.* at 455. Instead, if there is "some evidence" to support the decision of the hearing examiner, the court must reject any evidentiary challenges by the plaintiff. *Id.* at 457. Overall, judicial review of a prison disciplinary decision is limited to ensuring that the prisoner was afforded certain procedures, the action against them was not arbitrary, and that the ultimate decision has some evidentiary support. *See id.*

Here, Evans argues that he did not receive appropriate due process in either disciplinary proceeding because he did not receive the operative Incident Reports within twenty-four (24) hours of the alleged incidents. (Doc. 1 at 6.) While Evans is factually correct insofar as he did not receive those Incident Reports within twenty-four (24) hours of the alleged incidents because they had to be rewritten, he is mistaken that these failures constitute a due process violation.

- 28 -

The record in this case shows that, regardless of any minor delay in Evans's receipt of copies of the operative Incident Reports, he received the requisite minimum procedural requirements of due process throughout both disciplinary proceedings. First, he had the right to appear, and did appear, before the DHO, an impartial decision-making body in both proceedings. (Docs. 11-6 at 2; 11-8 at 2–3.) Second, Evans received well more than twenty-four (24)-hour advance written notice of the disciplinary charges before the hearings occurred. As to Incident Report No. 3781449, Evans received a copy of the rewritten Incident Report on June 8, 2023, received copies of his Notice of Inmate Rights and Notice of Hearing on June 9, 2023, and had his hearing five (5) days later, on June 14, 2023. (Docs. 11-5 at 2; 11-10 at 2; 11-11 at 2; 11-6 at 2.) Regarding Incident Report No. 3803470, Evans received a copy of the rewritten report on July 28, 2023, received copies of his Notice of Inmate Rights and Notice of Hearing on August 2, 2023, and had his hearing seven (7) days later, on August 9, 2023. (Docs. 11-7 at 2; 11-12 at 2; 11-13 at 2; 11-8 at 2.) Third, although Evans asserts, without proof, that staff would not let him access his personal property so he could properly defend himself during the hearings (Doc. 1 at 6), the DHO's Reports from both disciplinary proceedings show that he had the opportunity to present documentary evidence and call witnesses, but he declined to do

so. (Docs. 11-6 at 2, 3; 11-8 at 2, 3–4; 11-11 at 2; 11-12 at 2.) Fourth, even though it does not appear that Evans is illiterate or that there were complex issues involved in his cases, he was provided with the opportunity to have assistance from a staff member, which he refused. (Docs. 11-6 at 2; 11-8 at 2, 3–4; 11-11 at 2; 11-12 at 2.) Finally, in both disciplinary proceedings Evans received written decisions from the DHOs which explained the evidence relied upon in support of their decisions and the reasoning for the disciplinary sanctions imposed. (Docs. 11-6 at 2–5; 11-8 at 2–6.)

In addition to having received adequate due process, Evans's legal claim about his delayed receipt of the operative Incident Reports lacks merit because the regulation that he relies upon, 28 C.F.R. §541.5(a), does not impose a mandatory obligation on BOP staff to always provide an inmate with a copy of the incident report within twenty-four (24) hours of the alleged incident. Rather, it only states that an inmate "will ordinarily" receive the report within twenty-four (24) hours. 28 C.F.R. §541.5(a). Moreover, a violation of this regulation does not give rise to a protectable liberty interest for purposes of a due process claim. *See Wesley v. Mooney,* No. 1:14-cv-980, 2017 WL 679855, at *4 (M.D. Pa. Feb. 21, 2017) ("[T]here is no federal constitutional liberty interest in having . . . prison officials follow prison regulations." (citing *Phillips v. Norris*, 320 F.3d 844, 847 (8th Cir. 2003) and

- 30 -

*Culbert v. Young*, 834 F.2d 624, 628 (7th Cir. 1987)); *Jackson v. Cain*, 864 F.2d 1235, 1251 (5th Cir. 1989) (explaining that the failure to follow procedural regulations "does not establish a violation of due process because constitutional minima may nevertheless be met"). As such, the failure to provide Evans with copies of the rewritten Incident Reports within twenty-four (24) hours of the incidents referenced therein does not constitute due process violations, especially considering he received sufficient notice of the charges against him prior to the hearings, and he received, at least, the minimum procedural due process requirements throughout both disciplinary proceedings. *See, e.g.*, *Terry v. Fondren*, No. 08-cv-1059, 2008 WL 5071077, at *5–6 (D. Minn. Nov. 24, 2008) (concluding that BOP's failure to comply with BOP regulation requiring staff members to provide incident reports to inmates within twenty-four (24) hours of the incident forming the basis for the reports did not justify Section 2241 habeas relief because the inmate received adequate notice of the charges against them and the other due process requirements set forth in *Wolff* were satisfied).

Along with his complaint about the delay in his receipt of the Incident Reports, Evans complains that as to Incident Report No. 3781449, the "DHO did not put a time and date stamp on the report." (Doc. 1 at 6.) It is unclear what Evans is referring to here. The DHO's Report issued after the hearing

on June 14, 2023, is signed and dated by both the DHO and the FCI Bennettsville staff member who delivered the DHO's Report to Evans. (Doc. 11-6 at 5.) Accordingly, Evans's contention is factually meritless.

Evans's final argument is that the DHO's sanctions consisting of a $22 monetary fine and the forfeiture of fifty (50) non-vested GCT in the proceedings relating to Incident Report No. 3803470 exceeded the allowable punishment for the offense charged. (Doc. 1 at 6.) This argument is also meritless.

As stated above, the BOP regulations separate prohibited acts by prisoners into four (4) categories based on severity: Greatest, High, Moderate, and Low. *See* 28 C.F.R. §541.3(a). The offense charged in Incident Report No. 3803470, *i.e.*, possessing a hazardous tool, is included among the Greatest Severity Level Prohibited Acts. *See id.* §541.3(b) and Table 1. The available sanctions for Greatest Severity Level Prohibited Acts are:

A. Recommend parole date rescission or retardation.

B. Forfeit and/or withhold earned statutory good time or non-vested good conduct time (up to 100%) and/or terminate or disallow extra good time (an extra good time or good conduct time sanction may not be suspended).

B.1. Disallow ordinarily between 50% and 75% (27-41 days) of good conduct time credit available for year (a good conduct time sanction may not be suspended).

B.2[.] Forfeit up to 41 days of earned First Step Act (FSA) Time Credits (see 28 CFR part 523, subpart E) for each prohibited act committed.

C. Disciplinary segregation (up to 12 months).

D. Make monetary restitution.

E. Monetary fine.

F. Loss of privileges (e.g., visiting, telephone, commissary, movies, recreation).

G. Change housing (quarters).

H. Remove from program and/or group activity.

I. Loss of job.

J. Impound inmate's personal property.

K. Confiscate contraband.

L. Restrict to quarters.

M. Extra duty.

*Id.* As shown by this list, all sanctions the DHO imposed as to Incident Report No. 3803470 – the loss of GCT, the imposition of disciplinary segregation, the forfeiture of non-vested GCT, the loss of phone privileges, and a monetary fine, are permissible sanctions for the offense charged. Accordingly, Evans's contention that those sanctions did not satisfy the "requirements" for the offense committed is incorrect and meritless.

## III.  CONCLUSION

Based on the foregoing, the Court will deny the petition for a writ of habeas corpus under Section 2241. An appropriate Order follows.

**MALACHY E. MANNION**
**United States District Judge**

**DATE:** 11/1/24
24-1370-01